## GREEN *v.* STATE.

### Opinion delivered January 8, 1898.

CRIMINAL EVIDENCE—OPINION AS TO SANITY.—A witness in a murder case, after describing the conduct of the defendant on the night before the killing, may testify that defendant did not seem to know what she was doing. (Page 530.)

SAME—HEREDITARY INSANITY.—Proof that some of defendant's blood-relatives were insane is admissible as cumulative evidence after there is some evidence that defendant has shown signs of insanity. (Page 530.)

SAME—CONDUCT OF DEFENDANT AFTER ARREST.—There being other proof of mental derangement, it was error to exclude the testimony of a witness that he had had frequent conversations with defendant from the time of the arrest until the trial, that she seemed very unconcerned, and to think that she had done right, to be unconcious of her condition, and to have no apprehension or fear of punishment, and that she frequently laughed and engaged in singing. (Page 531.)

EXPERT—OPINION AS TO SANITY.—After the evidence is all in, an expert may be asked his opinion as to defendant's mental condition at the time of the killing, assuming the existence of certain facts which the evidence tends to prove. (Page 532.)

SAME—QUALIFICATION.—In the exercise of its discretion to determine whether the experience of a witness has been such as to make his opinions of any value, the trial court may refuse to permit a medical witness to testify as to defendant's sanity where the witness states that he has practiced medicine only a short time, and has never had any experience in the treatment of mental diseases, and has only studied them so far as ordinary cases are concerned. (Page 532.)

SAME.—A medical witness, who testifies that he has been practicing medicine more than twenty-one years, that he knows something about insanity, having made a study of nervous diseases and treated them to some extent, is competent to testify his opinion as to defendant's sanity. (Page 534.)

INSANITY—TEST OF RESPONSIBILITY.—If a person is incapable, because of idiocy or lunacy, of distinguishing between right and wrong, as to a particular act, at the time he does it, he is not criminally responsible for the act; but if he has such capacity, mere emotional insanity, or passion or frenzy produced by anger, jealousy, or other passion, will not excuse him. So if, from evil association and indulgence in vice, his conscience ceases to control or influence his actions, and he is otherwise capable of committing crime, he is responsible. (Page 534.)

SAME—MENTAL DISEASE.—One who knows right from wrong may be so afflicted with a disease of the mind as thereby to have so far lost the power to choose between the right and wrong, and to avoid doing the act alleged to be a crime, that his free agency was at that time destroyed, if the alleged crime was so connected with such mental disease as to have been the product of it solely. (Page 334.)

Appeal from Jackson Circuit Court.

RICHARD H. POWELL, Judge.

*M. M. Stuckey* and *Phillips & Campbell*, for appellant.

The mental condition of a party being in issue, evidence of his habits, physical condition, conduct and conversations, is admissible. 15 Ark. 601; 20 Ark. 216; 54 Ark. 598; 55 Ark. 259; 61 Ark. 241. The court's ruling precluded the introduction of any evidence as to the defendant's state of mind, because it held that defendant must first establish a disordered mind, before they could prove the acts, conversations, etc., relied on to establish that very fact. The hypothetical questions asked Dr. Hurt by defendant were based on material facts proved, or offered to be proved, by defendant. It was error to exclude them. Rogers, Exp. Test. 43. The court erred in holding Dr. Burns and Brewer not to be qualified as experts. Rogers, Exp. Test. 1; 23 Ark. 733. It was error for the court to use the word "offense" as descriptive of the act for which defendant was on trial. Const. art. 7, § 23; 43 Ark. 73; 51 Ark. 147; 54 Ark. 489; 62 Ark. 126. The court also erred in remarking, in the hearing of the jury, that defendant *"must first show some element* of insanity," etc., for this takes the weight of the evidence from the jury. The court erred in permitting counsel for state to use improper language in the hearing of the jury. 27 Am. St. Rep. 328; 9 Am. St. Rep. 559; 56 Ark. 473; 61 Ark. 130; 37 S. W. 877; 62 Ark. 126; 62 Ark. 516. The instructions of the court as to insanity were erroneous. 50 Ark. 511; 54 Ark. 588; 55 Ark. 259; Clark, Crim. Law, p. 52, § 30. The court erred in refusing instructions asked by appellant as to self-defense and insanity. 55 Ark. 259; Clark, Crim. Law, p. 53. The court should have instructed the jury as to the grades of manslaughter. 34 Ark. 232. The verdict is too indefinite, because it does not specify the grade of manslaughter. 26 Ark. 323; *id.* 333; *id.* 534; 57 Ark. 560.

*E. B. Kinsworthy*, Attorney General, for appellee.

Evidence that certain causes might induce insanity is not admissible, without laying or offering to lay a basis of proof to show that insanity actually existed. 1 Wh. & Stille's Med. Jur. § 377; 35 Fed. 80; 31 Ind. 492; 1 Wh. Cr. Law, § 85; 20 Nev. 333; Buswell, Insanity, § 216. Evidence of hereditary insanity is only competent when a basis has been laid by proof of defendant's own insanity. 1 Wh. & St. Med. Jur. § 377; 28 Ill. 306; 84 Pa. St. 200; 1 Wh. C. L. § 65; 6 Jones (N. C.), 471. The opinions of expert witnesses must be founded on facts observed or described. Buswell, Insanity, §§ 250–264. The court had a right to refuse Dr. Brewer as an expert. Buswell, Insanity, § 256. Emotional insanity is not recognized in our law. 55 Ark. 262; 102 N. Y. 250. It was no error to refuse the declaration as to self-defense. 38 Mo. 271–273; 85 Mo. 190; 81 Ala. 38; Clark, Crim. Law, pp. 151–156; 49 Ark. 549; 46 Ark. 283; 40 Ark. 454; 37 Ark. 256. The verdict is definite enough. 47 Ark. 297.

BATTLE, J. Frances Green was indicted in the Jackson circuit court, at the July term, 1897, for the crime of manslaughter, committed by shooting Walter Donalson with a gun. She pleaded not guilty, was tried and convicted, and appealed.

The evidence adduced in the trial tended to prove the following facts: Walter and Francis were engaged to be married. She was eighteen years old, never had been married, and was of good standing, as a colored girl, in Jackson county, where she resided. She was second teacher in the Sunday school, and had a class of little girls. During her engagement to marry, Walter seduced her by virtue of a promise of marriage, and she became pregnant with a child. At his instance, she visited Pine Bluff. He was to follow, and they were to be married. On the Friday next before the killing, she returned home, and learned that Walter was to marry, in a few days, a woman named Lettia. She was greatly distressed. From the time of her return until Monday following, the 24th of May, 1897, she did not eat or sleep. Her conduct was entirely changed. "She would start," a witness said, "to do one thing, and do another, and start to say one thing, and say another." Her mother testified that during Sunday night, she went to bed, and then arose and went

to her, "and kept walking backwards and forwards, patting her breast," and "she would just squat down and put her hands on her breast." When her mother spoke to her, she said, "My mind is worried to death." After making the foregoing statement, and while testifying, appellant's counsel asked, "From what she said, and from her conduct, did she seem to know what she did? And witness replied, "No sir; she did not. She did not know what she was doing." And, the state objecting to the question and answer, the court excluded it, and the appellant objected and saved exceptions. On that night (the Sunday night mentioned), the 23d of May, 1897, Walter and Lettia were married. On the morning next following, Lugenia Carter and Walter, with Lugenia's baby in his arms, and Lettia, in company, walking, passed near the house where Frances was residing with her parents. Frances was in the house at the time, and saw them pass; and after they did so, and had gone a short distance, she seized a gun and followed, and, when she approached near, commanded him to halt; and he turned, and she said: "Walter, you have fooled me long enough. You told me yesterday it was a long lane that had no turn. You have to die. Hand Lugenia the baby." She testified that he then moved the baby from his right to his left arm, and his hand, as she thought, for his pistol, and she, without taking any aim, shot him, and that she killed him because he had "stolen her virtue," and had threatened to kill her, and had "scandalized" her among her people. She made no attempt to escape.

After the testimony tending to prove the foregoing facts had been adduced, Dr. Hurt, who had been in active practice as a physician for over fifty years, and had studied diseases of the mind, seen insane persons, and treated persons suffering from diseases of the mind frequently, testified that the condition and acts of Frances, as before stated, indicated an aberration of the mind.

After Joel Jackson had testified that he was acquainted with the appellant, her father, mother, grandmother, her great-uncle and her great-aunt and had known them all his life, the appellant offered to propound to him questions, and prove by him what he stated in reply thereto, in the presence of the court and in the absence of the jury, as follows:

Question. "State to the jury some of his [Peter Speed, great-uncle of defendant] acts, showing his condition of mind."

Answer. "Well, he was a kind of crazy fellow. They could not do anything with him, so they put him in a house, and chained him there. His sister Rose got in the same fix, and they built a little house and put her in it."

Q. "State what you know as to how his owner had to keep him."

Ans. "They could not do anything with him. They had to chain him and put him in a little house, as I have said."

Q. "State any acts of hers [great-aunt of defendant] that you know of, showing her condition mentally."

Ans. "She got crazy, and they had to put her in a little house, too; put her in a house, and chained her there. There is always some of the family in that condition. There is some of them in Woodruff county now, in the same fix."

Q. "State such facts as you may know about her [grand-mother of defendant] that will show her condition of mind."

Ans. "Her grandmother has no mind. She is in Woodruff county now. She is so crazy they have to keep her tied up."

Q. "State if you know any acts of her [mother of defendant] that go to show her mental capacity during the time she was pregnant."

Ans. "Yes, sir. There was an old man that went into the woods to get logs. He came up missing in two or three days. We thought he was gone, as we could not find him. One day we went out to hunt him. They knew he was cutting some logs. They found him dead, lying on a log, and he had turned right black. That time of day, when the two fellows found him, they told us, and this girl went out there with the others, and she got frightened at him; and in two or three days they found this girl, but it was a good while until she got her mind again."

Q. "Do you know any circumstances that happened just before Frances' birth that brought about a great shock to her mother?"

Ans. "Yes, sir. That is about the old gentleman I have just stated."

Q. "State how much alike defendant and her mother are in disposition."

Ans. "They are just about the same. There is not a bit of difference in them."

Q. "While Frances' mother was pregnant with Frances, what was her disposition towards the members of her family?"

Ans. "She was mighty unruly and hard to get along with; what I call crazy, so you could not do much with her."

Q. "How did she treat the members of her family during that time?"

Ans. "Treated them mighty cruel,—what I call cruel."

Q. " Did they give her any cause for such treatment during that time?"

Ans. "No, sir, they did not give her a bit. I think she just had those foolish spells,—just gave herself them."

And the court refused to allow the interrogatories to be propounded, and the answers to go to the jury as evidence.

J. J. Walker having testified that he was sheriff of Jackson county, and had had the appellant in custody since the evening of the killing, she offered to prove by him that he had frequent conversations with her, from the time he arrested her to the present, and that she seemed very unconcerned, and to think that she had done right, to be unconscious of her condition, and to have no apprehension or fear of punishment, and frequently laughed and engaged in singing. And the court refused to allow her to do so.

Appellant then recalled Dr. Hurt, and offered to prove that the tendency of insanity is to run in families, and propounded to him the following question: "Doctor, assuming it to be a fact that there was a strong hereditary taint of insanity in the blood of the defendant; that she had a great-uncle and a great-aunt, on her mother's side, who were so violently insane that they had to be kept in confinement; that her mother was of a very nervous temperament, and, especially during pregnancy, was unusually irritable and excitable, and often, while in such condition, did acts without apparent motive, and was subject to outbursts of rage, and violent abuse of the members of her family, without any adequate cause, and that such was her conduct especially while pregnant with and carrying this defendant in her womb;

assuming, further, that defendant, in physical appearance and in constitution, habits, and disposition, strongly resembles her mother; that defendant, at the age of eighteen years, became greatly infatuated with a young man of her own color, who promised to marry her, and by virtue of such promise of marriage induced her to yield to him in repeated acts of sexual intercourse, and she became pregnant by him; that he suddenly, and unexpectedly to her, married another woman; and assuming, further, that a few days after such marriage he unexpectedly came in her way with his wife, and carrying a small child in his arms, and that she shot and killed him; that immediately after doing so she seemed mentally relieved, made no attempt to escape, openly avowed she was glad of her deed, and declared she wanted to be hanged; assuming, further, that while confined in jail, and up to the time of her trial, she seemed to fear no punishment for her deed, and frequently laughed and engaged in singing; assuming all these propositions to be true, state your opinion as to whether the defendant was sane or insane at the time she fired the fatal shot,"—and offered to prove by him that, if the facts assumed be true, he was of the opinion that the shooting was an act of insanity, but the court refused to allow the testimony to be introduced.

Dr. Burns then testified that he was a physician and surgeon, and had been in the practice since 1892 (about five years), and "had studied mental dieseases, so far as ordinary cases were concerned;" that the physician, in this country, in the scope of his general practice, treated mental diseases and disorders; and that he had studied them as a branch of the medical profession, but never had "experience in the treatment of aberration or mental diseases" to any extent. Appellant then undertook to examine him as a witness touching her sanity, but the court refused to allow her to do so, because he was not an expert.

A. G. Brewer testified that he was a regular physician and surgeon; had been practicing more than 21 years; knew something about insanity, having made a study of nervous diseases, and treated them to some extent; that every physician who had practiced 20 years would have that to do. Appellant also undertook to examine him as a witness as to her sanity, but

34

the court would not permit her to do so, because he was not an expert.

Instructions to the jury upon the subject of insanity were given by the court over the objections of appellant, and others were asked for by her and refused, and exceptions were saved, but it is unnecessary to set them out in this opinion. A statement of the law upon the subject of the same will be sufficient to show what instructions upon the subject should have been given.

The court erred in excluding the testimony of the mother of the appellant as to the sanity of the daughter on the night preceding the killing. She stated that Frances, the accused, did not seem to know what she did. Before making this statement, she had testified as to how appellant had acted,—of her strange conduct. Having stated the facts upon which the opinion was based, the testimony excluded was competent. *Shaeffer* v. *State*, 61 Ark. 241, 245.

The testimony of Joel Jackson as to the sanity of the ancestors and a great-uncle and great-aunt of appellant was competent. His testimony tended to show that insanity had existed in the family for some time,—first, in the grandmother and great-uncle and great-aunt, and then temporarily in the mother. But this testimony was not admissible until some evidence had been adduced that appellant had shown signs of her own insanity. Evidence of hereditary insanity is only admissible as cumulative evidence,—as corroborative of the other. Upon the evidence adduced in this case at the time it was offered, as before stated, the testimony of Jackson should have been admitted. *People* v. *Smith*, 31 Cal. 466; *People* v. *Garbutt*, 17 Mich. 10; *Laros* v. *Com.*, 84 Pa. St. 200; *Baxter* v. *Abbott*, 7 Gray, 71, 81; 1 Wharton's Cr. Law, § 65, and cases cited.

In *State* v. *Christmas*, 6 Jones (N. C.), 471, it is said that "where hereditary insanity is offered as an excuse for crime, it must appear that the kind of insanity proposed to be proved as existing in the prisoner is no temporary malady, but that it is notorious, and of the same species with which other members of the family have been afflicted." The court in that case seems to have assumed that hereditary insanity of a permanent type, and notorious, is capable of being established by general

reputation, and not dependent upon particular facts and proof, about which witnesses may differ, and that it does not change its species when transmitted from the ancestor to his descendants. This is an assumption of fact. Surely the court did not mean to say that a prisoner cannot show that he has been rendered irresponsible for crime by inheriting insanity of any description. As a statement of fact, it should not be accepted as true, in judicial proceedings, without evidence of its truth. According to our information, it is not true. Wharton, in his work on Medical Jurisprudence, says it is not, and further says: "Insanity, it has been well said, is protean. Sometimes it may be so concealed that it may escape the knowledge of all but the closest observers. Often, as has been seen, it changes its form from time to time in the same individual; and when passing from parent to child it almost always varies its type." 1 Wharton & Stille's Medical Jurisprudence, § 376.

The facts which appellant offered to prove by Walker come within the spirit of the rule stated in *Bolling* v. *State*, 54 Ark. 588. In that case it was said: "As a rule, the conduct as well as the language of a defendant after the commission of a crime, not forming a part of the *res gestæ*, is inadmissible in his favor; but when insanity is set up, the rule is sometimes different. They are then admissible whenever they are so connected with, or correspond to, evidence of disordered or weakened mental condition preceding the time of the offense, as to strengthen the inference of continuance, and carry it by the time to which the inquiry relates, and thus establish its existence at that time; or whenever they are of such a character as of themselves to indicate unsoundness to such a degree, or of so permanent a nature, as to have required a longer period than the interval for its production or development. *Com.* v. *Pomeroy*, 117 Mass. 143. As such acts, conduct and declarations were admissible, was it competent for the witness, after stating them, to state his opinion, based upon them, as to the sanity of the defendant? The affirmative was expressly ruled in *Kelly's Heirs* v. *McGuire*, 15 Ark. 601, and has been since the settled rule of this court." The facts which the accused attempted to prove by Walker in this case so corresponded with the evidence of

her disordered mental condition before and at the time of the offense as to strengthen the inferencè of its existence at such time, and of its continuance thereafter to the time to which they relate. They tend to show an unconsciousness of having done wrong, and an incapacity to appreciate the nature and consequences of her act. They may shed a dim light upon the subject of inquiry, but they give enough to have entitled them to be shown by evidence, and to receive such consideration by the jury as to them it may have appeared they deserved.

The evidence improperly rejected should have been admitted, Dr. Hurt should have been required to answer the hypothetical question propounded to him as an expert. 2 Bishop, Criminal Procedure (3 Ed.), § 685.

Our next subject of consideration is the refusal of the court to allow Drs. Burns and Brewer to testify as experts. The competency of a witness to give testimony as an expert is confined to matters pertaining to his special calling or profession. *Dole* v. *Johnson*, 50 N. H. 452; *Missouri Pacific Railway Co.* v. *Finley*, 38 Kas. 550, 560; Rogers, Expert Testimony (2 Ed.), p. 45, § 19. Such persons are allowed to give testimony by way of opinion, because they are presumed to have acquired more skill and knowledge, and are more capable of forming a correct opinion as to the subject-matter of inquiry, by previous study, education, or experience, than jurors of average intelligence; and their opinions are admitted as evidence for the purpose of aiding the court or jury to understand questions which inexperienced persons are not likely to decide correctly without such assistance. *Fordyce* v. *Lowman*, 62 Ark. 74.

The reason for allowing him to testify as an expert, and the object of his testimony, indicate to some extent the qualifications he should possess in order to make him a competent witness. His competency depends upon either his actual experience with respect to the subject of investigation, "or his previous study and scientific research concerning the same, and sometimes on both combined." If otherwise qualified, he may express an opinion as an expert on a matter pertaining to his special calling or profession, although his knowledge of that particular matter has been derived from study alone. *Taylor* v. *Railway*, 48 N. H. 304; *State* v. *Baldwin*, 36 Kas. 1; *State*

v. *Wood,* 53 N. H. 484; *Tullis* v. *Kidd,* 12 Ala. 648; *Citizens Gas Light & Heating Co.* v. *O'Brien,* 19 Ill. App. 231; Rogers, Expert Testimony (2 Ed.), p. 45, § 19.

On the subject of opinions based on study, Mr. Justice Campbell truthfully says: "No one has any title to respect as an expert, or has any right to give an opinion upon the stand, unless as his own opinion; and if he has not given the subject involved such careful and discriminating study as has resulted in the formation of a definite opinion, he has no business to give it. Such an opinion can only be safely formed or expressed by persons who have made the scientific questions involved matters of definite and intelligent study, and who have by such application made up their own minds. In doing so, it is their business to resort to such aids of reading and study as they have reason to believe contain the information they need. This will naturally include the literature of the subject. But if they have only taken trouble enough to find or suppose they find that certain authors say certain things, without further satisfying themselves how reliable such statements are, their own opinions must be of very moderate value, and, whether correct or incorrect, cannot be fortified before a jury by statements of what those authors held on the subject. The jury are only concerned to know what the witness thinks, and what capacity and judgment he shows to make his opinion worthy of respect." *People* v. *Millard,* 53 Mich. 63, 76.

No rule can be laid down by which it can be accurately determined how much skill, knowledge, or experience a witness must possess to qualify and entitle him to testify as an expert. He must at least have sufficient to enable him to be of some assistance. "That question, however, rests within the fair discretion of the court, whose duty it is to decide whether the experience or study of the witness has been such as to make his opinion of any value." His (circuit court's) decision of the question will not be reviewed by this court, unless it clearly appears to be wrong.

According to the foregoing test, the qualification of Dr. Burns as an expert was doubtful. He never had experience in the treatment of mental diseases to any extent, and had only studied them "so far as ordinary cases were concerned." How

far ordinary cases were concerned does not appear. His own testimony does not clearly or satisfactorily show that he was qualified to give an opinion as an expert that would have been of any aid or assistance to the jury.

Dr. Brewer should have been allowed to testify as an expert. His testimony does not show that he is possessed of the highest degree of skill, or is very learned, as to insanity (and he does not profess to be), but enough appears to have entitled his opinion to go as evidence to the jury. By means of a cross-examination, it could have been shown how much it was worth.

The most important question in the case is, what are the legal tests of responsibility of a person who has committed unlawful homicide, for that crime, where the defense of insanity is interposed? The principal test is the ability to distinguish right from wrong. "If a person is incapable, because of idiocy or lunacy, from distinguishing between right and wrong as to a particular act at the time he does it, he is not criminally responsible" for the same. If he has such capacity, mere emotional insanity, or passion or "frenzy produced by anger, jealousy, or other passion, will not excuse him." Moral insanity, also, will not excuse. If, from evil association and indulgence in vice, his conscience ceases to control or influence his actions, and he is otherwise capable of committing crime, he is responsible.

The rule as to the effect of insane delusions upon the responsibility of the person entertaining them for crime was stated by this court in *Bolling* v. *State*, 54 Ark. 588.

It is insisted that, although appellant knew right from wrong as to the particular act in question, at the time it was committed, yet she would not be legally responsible, if, in firing the fatal shot, she "acted from an irresistible impulse, arising from a defect of will, caused by the diseased condition of her mind, and not from mere anger or revenge." It is true that a person may have such knowledge, and yet be irresponsible for a crime committed by him. But it is not true unless the two following conditions, as held in an exceptionally able and comprehensive opinion, in *Parsons* v. *State*, 81 Ala. 577, concur: Such person, at the time he committed the act, must

have been so afflicted with a disease of the mind as thereby to have "so far lost the power to choose between the right and wrong, and to avoid doing the act, as that his free agency was destroyed; and (2) at the same time the alleged crime must have been so connected with such mental disease, in relation of cause and effect, as to have been the product of it solely,"— that is to say, without the aid of any other cause. This subject is fully discussed in the following authorities: *Parsons* v. *State*, 81 Ala. 577; *State* v. *Jones*, 50 N. H. 369; Bishop, New Criminal Law, ch. 26; 3 Rice, Evidence, §§ 402–416; Clark, Criminal Law, pp. 52, 60; 1 Wharton, Criminal Law (10 Ed.), §§ 34, 45; 1 McLain, Criminal Law, §§ 156, 157.

For the errors indicated the judgment of the circuit court is reversed, and the cause is remanded for a new trial.