RAPRICH *v.* STATE.

Crim. 4006

Opinion delivered October 12, 1936.

*Trimble, Trimble & McCrary* and *Thos. D. Williams,* for appellant.

*Carl E. Bailey,* Attorney General, and *Guy E. Williams,* Assistant, for appellee.

SMITH, J. This appeal is from the judgment of the Lonoke circuit court sentencing appellant to a term in the penitentiary for the crime of burglary, and the reversal of this judgment is asked upon the grounds that incompetent testimony was admitted, and that the prosecuting attorney was permitted to make an improper and prejudicial argument before the jury.

The undisputed testimony shows that during the night of February 16, 1935, appellant and three other young men broke into a bakery shop in the town of Lonoke, and removed therefrom an iron safe containing something more than $300 in money. Entrance into the building was effected through a skylight. A rope was let down into the building, on which one of the young men slid down and opened a rear door. The safe was loaded into an automobile owned, or at least driven, by appellant, and carried some miles out of town and broken open and the contents divided. Appellant and two of his associates left Lonoke about 3 p. m., and returned about 7 p. m. They drove through Lonoke on their return and invited another young man named Burrus to join their party. After the commission of the crime, in which Burrus participated, they drove back to Little Rock, which city they reached about 2 or 3 a. m. Burrus left the car before reaching Little Rock.

The evidence as to the crime itself consists largely of the narration of appellant's confession, which appears to have been freely made, and shows a crime intelligently planned and successfully executed.

Appellant's participation is not denied, and the defense of insanity was interposed, and testimony was offered in support of that plea. The case was submitted under instructions to which no objections are made.

Two physicians testifying as experts expressed the opinion that appellant was insane. Other testimony by lay witnesses was given to the same effect. Two physicians testified on behalf of the state as experts that appellant was sane, one of these less positively than the other. Certain non-expert witnesses were permitted to express the opinion that appellant was sane, and the admission of this testimony is assigned as error. The testimony of W. J. Beard and Mrs. Tom Morris is especially complained of.

Beard testified that he was a justice of the peace, and had known appellant from his childhood. The witness was asked: "During that time you have seen him and talked with him and observed him from time to time?" Witness answered that he had. Witness also testified that he knew appellant in February, 1935, and in his opinion appellant was sane at that time. This testimony was admitted without objection. On his cross-examination witness stated that appellant was tried in his court for breaking into the bakery; that appellant did not testify at that time. Appellant had been in witness' house in 1931, where he had a conversation with him. Had no other conversation with appellant, but in the capacity of justice of the peace had tried appellant upon the charge of driving an overloaded truck. On his redirect examination witness testified that he had seen appellant on the streets, "passed him a number of times." Saw him every few days, and knew him like he did other young men in town.

A motion to exclude this testimony, upon the ground that no proper foundation had been laid for its admission, was overruled.

Mrs. Morris was permitted to testify that her son was one of the young men who broke into the bakery, and that appellant had twice come to her house just before the burglary looking for her son. The first occasion was about a week before the burglary, the second about two days before that event. She had known appellant all of his life, and had seen him frequently. She testified, in part, as follows: "Q. Mrs. Morris, have you ever had conversations with him? A. Not exactly. Q. But you say that he has been to your house? A. Yes, sir. Q. Have you ever heard him talk to other people? A. Yes, sir. Q. How often? A. I have known him—I knew him when he was a school boy, and I have seen him and heard him talk. Q. When he came up to your house a few days before this robbery took place, did you talk to him on both occasions? A. Yes, sir. Q. Did he talk like a crazy person? A. No. Q. Did he talk like any other person would? A. Yes, sir. Q. Did he talk like he was an insane person? A. No, sir. Q. Do you tell the jury that, in your opinion, he knows right from wrong? A. Yes, sir. Q. Do you think that he knew it was wrong to commit a robbery? A. Yes, sir."

At the conclusion of the direct examination appellant's counsel moved to exclude the testimony of Mrs. Morris, upon the ground that she had not sufficiently qualified herself to be permitted to express an opinion.

Upon her cross-examination she testified as follows: "Q. To what extent did you talk to him on these two occasions? A. He asked me where Floyd was, and I told him he had gone to Little Rock, and he said to tell him when he came back he wanted to see him. Q. Was that the extent of your conversation, and is that all the conversation you have had with him during his life? A. Yes. Q. Did you ever see him on the street, bareheaded and barefooted? A. No, sir. Q. You don't know anything about his drinking liquor or anything like that? A. No, sir. Q. He never has been in your home? A. He has been there a few times. Q. And the extent of your acquaintanceship with him is the time he was there to see your son, Floyd, and that was the extent of your conversation with him? A. Yes, sir, but I have heard him

talk to other people. Q. To whom? A. I don't re-member—but I have heard him talking on the street. Q. Did you ever hear what he said to other people? A. I never heard him say anything that sounded like he was crazy. Q. Were you paying any particular attention to him? A. No, sir.''

It is insisted that it was error to permit these wit-nesses to express an opinion as to appellant's sanity, for the reason that they were not shown to have had sufficient opportunity to form an intelligent and rational opinion upon' that subject, and this appears to be the most serious question presented on this appeal.

The note of the annotator in the case of *State* v. *Schneider,* 72 A. L. R. 579, deals very extensively with the conditions under which a non-expert witness may be permitted to express an opinion as to another's sanity. We do not cite or review any of these cases, as we have many cases of our own on the subject. The late case of *Spence* v. *State,* 184 Ark. 139, 40 S. W. (2d) 986, cites a number of these cases and, among others, the case of *Shaeffer* v. *State,* 61 Ark. 241, 32 S. W. 679.

It is very earnestly insisted that the testimony in the instant case is sufficiently like that in the Shaeffer case to be controlled by it and to require the reversal of the judgment in the instant case as was ordered in the Shaeffer case. In announcing the test for the admis-sion of the opinion of non-experts judge BATTLE said that such witness must recite the facts upon which the opinion is based, and the testimony must show such relations to have existed between the party alleged to be insane and the witness as fairly to lead to the conclusion that the witness has a reasonable foundation upon which to base the opinion; and that whether the information is sufficient for that purpose is a preliminary question for the court to decide affirmatively before such testimony may be admitted at all, and after its admission the weight to be given such testimony is a question for the jury to decide.

It is very earnestly insisted that there is the same lack of foundation for the admission of the testimony of the non-experts as existed in the Shaeffer case, and

that the judgment in the instant case must be reversed as was done in the Shaeffer case.

We think, however, that the cases are distinguishable on the facts. The opinion in the Shaeffer case sets out the testimony of the non-experts, and points out the lack of foundation for the admission of their opinions. The witnesses there were J. L. Moore and B. C. Black, and their testimony is there recited as follows: "Moore testified as follows: 'I have known the defendant for five or six years. I have never had him working around me. From what I have seen of him during that time and observed, I don't think there is anything wrong with him.' Black said: 'I have seen the defendant on the street for several years. I never noticed anything peculiar about him. From what I have seen of him, I never thought but that he was all right!' "

It will be observed that neither of these witnesses had ever had any conversation or association with the accused. They had known him five or six years, and had merely seen him on the streets. Here, the witnesses, Mrs. Morris and Beard, had better opportunities to observe the accused. Beard had known him all his life. Appellant had twice appeared as a defendant in Beard's court. Witness had a conversation with appellant in witness' home, and had thereafter seen him "pretty often." Mrs. Morris had also known appellant all his life. He was the associate of her son. She had conversed with appellant twice within a week of the burglary. Appellant had a mission which he sought to perform, and in furtherance of it he asked an appointment, which was evidently later made and kept. The witnesses in the instant case, therefore, had an association with the accused and opportunities to acquire information about him which were totally absent in the Shaeffer case.

While the testimony is not entirely satisfactory, we are unable to say that the trial court abused the discretion he was required to exercise in passing upon the preliminary question of the competency of the testimony.

The same learned judge who wrote the opinion in the Shaeffer case also wrote the opinion in the case of *Green* v. *State*, 64 Ark. 523, 43 S. W. 973. Involved in

that case was the question of the competency of an expert to express an opinion as to the sanity of the accused. Judge BATTLE there said: "No rule can be laid down by which it can be accurately determined how much skill, knowledge, or experience a witness must possess to qualify and entitle him to testify as an expert. He must at least have sufficient to enable him to be of some assistance. 'That question, however, rests within the fair discretion of the court, whose duty it is to decide whether the experience or study of the witness has been such as to make his opinion of any value.' His (circuit court's) decision of the question will not be reviewed by this court, unless it clearly appears to be wrong."

The same rule would, of course, be applied in passing upon the action of the trial court in admitting the testimony of a non-expert witness. Such witness must show that he possesses such qualifications as to be of some assistance, and when that showing is made the decision of the trial court will not be reversed unless it clearly appears to be wrong.

In the Shaeffer case, *supra,* there was an entire lack of such showing on the part of the non-expert witnesses; but not so here.

See also *Jackson* v. *State,* 142 Ark. 96, 218 S. W. 369; *Woodall* v. *State,* 149 Ark. 33, 231 S. W. 186; *Griffin* v. *Union Trust Co.,* 166 Ark. 347, 266 S. W. 289.

In Smoot on Insanity (§ 597), in discussing the question of the competency of non-experts, it is said: "Just what amount of knowledge and acquaintance is necessary to qualify such a witness is largely governed by the facts of each case, and within the sound discretion of the trial judge, who may declare the witness incompetent where the preliminary examination shows the facts are insufficient to qualify the witness to express an opinion. But where such witness shows any reasonable opportunity to acquire knowledge of the subject's sanity through observation and association, and is able to state any facts upon which to predicate an opinion, the meagerness of such facts goes rather to the weight to be given the opinion than to its admissibility; and the opinion formed at the time, with the facts upon which

it is based, should go to the jury for what it is worth. The weight to be given to such testimony is exclusively within the province of the jury, if the facts upon which the opinion is founded themselves tend to show sanity or insanity.'' See also vol. II, Wharton's Criminal Evidence, (11th ed.), p. 1746.

In his concluding argument the prosecuting attorney commented upon the fact that appellant's three associates had entered pleas of guilty and had been sentenced to the penitentiary and stated that ''It would not be fair to send those boys to the penitentiary and to acquit appellant.''

Upon this subject the prosecuting attorney said: ''Gentlemen, you only have such law and order in your county as is brought about by the enforcement of the laws, and if the jury goes out and turns a fellow loose who is financially able to get up a defense and the other fellow who has no money is sent to the penitentiary * * * ''

Upon objection being made to the argument by counsel for appellant the court said: ''Gentlemen of the jury, the financial standing of a defendant has nothing to do with the law. If a man is rich or poor if he violates the law then he should be punished. And if he is as poor as Lazarus he should be protected if he is not guilty. The jury will be governed only by the testimony. What the counsel say has nothing to do with the law.''

Appellant's counsel objected that ''There is no evidence here showing the financial ability, in any degree, of any one.''

This objection was sustained, and the court said: ''Gentlemen of the jury, there is no evidence in this case as to the worth of any one connected with it. Rich or poor you are entitled to the same protection at the hands of the court, as stated to you before; you have been chosen to try this case on the law and the testimony, and no other cause should guide you in your deliberations. Decide this case upon the law and the testimony and let your verdict be accordingly.''

Conceding this argument to be improper, the error, if any, was cured by the admonition of the court.

Answering what appears to have been the argument of the counsel for appellant, that appellant, through his mental condition, lacked the power to resist the commission of a wrongful act, the prosecuting attorney said:

"Look at this defendant! This boy has had the advantages of a good education; he graduated from high school and had a year in college—but look at these other poor boys he led into this crime—they didn't have the fine opportunities that this boy had—they didn't know how to resist wrong like this defendant did; they never had the chance this boy had! And yet, with all his chances and education, he came back home from college and got three ignorant boys into all of this trouble, and then after they have been sent to the State penitentiary and are now serving their time, this boy comes in here and tells you that he ought not to be sent down there to serve his just time,—because he was suffering from an 'irresistible impulse' and not a witness * * *."

The objection was made to this argument that "There is no such testimony showing that this defendant got any one into trouble."

The court said: "An attorney has a right to express his opinion to the jury, and he has a reasonable range to express his said opinion on what might have happened—but your verdict, gentlemen of the jury, will be based upon the law and the evidence, and not the argument of counsel."

The prosecuting attorney proceeded to say: "The evidence in this case, gentlemen of the jury, bears out the statement I have just made to you. Two witnesses have just testified from the stand here today—Mrs. Morris testified that he was at her house twice, one time about a week before the robbery, and the second time about two days before it, after her boy Floyd Morris. Another gentleman took the stand, Mr. Lilly, and stated that on the day before and the day after the robbery Raprich was out to Burris' home; that he got him the day before the robbery and brought him home the day after the crime was committed. Now that shows that he was running after these boys and these boys were not leading him. Who said he couldn't resist it? Gentlemen, it was

the other boys who couldn't resist, not him! Yes, here we have a boy who finished high school with the highest honors, who won the State contest in Latin, who had a year in college—and he comes down here and leads these poor ignorant boys astray, and he thinks he can come in here and * * *."

Upon objection being made to the continuance of this argument the court said: "The prosecuting attorney can express opinion in his argument but his opinion is not the law in the case nor the evidence. You must decide this case upon the law and the testimony and not the argument on either side."

It was not improper for the prosecuting attorney to argue that appellant was not an irresponsible person who had been led into the commission of an act which he did not know was wrong, or, knowing that it was wrong, lacked the power to resist. The testimony reviewed by the prosecuting attorney furnished some foundation for the argument that appellant was not an irresponsible person who lacked the capacity to resist the solicitation of others to commit what would be a crime if done by a sane person, and the court properly ruled this was a question for the jury. We conclude, therefore, there was no error in this respect.

Considered in its entirety, we find no error in the record, and the judgment must be affirmed, and it is so ordered.