SIMS v. STATE.

Crim. 4054

Opinion delivered October 18, 1937.

*McDaniel, McCray & Crow,* for appellant.

*Jack Holt,* Attorney General, and *John P. Streepey,* Assistant, for appellee.

HUMPHREYS, J.  On information, in due form, of the prosecuting attorney of the seventh judicial district of Arkansas appellant was tried and convicted ·of murder in the first degree in the circuit court of Saline county for unlawfully, feloniously, maliciously and with premeditation and deliberation, killing his wife on the 9th day of May, 1937, with a double-bit ax.

From the judgment of conviction appellant has duly prosecuted an appeal to this court, arguing six assignments of error contained in his motion for a new trial as grounds for reversal of said judgment.

The first assignment of error argued is that the evidence is insufficient to sustain the verdict.

The evidence reflects that appellant had been convicted of transporting a stolen automobile across the state line and that he was sentenced for three years and after serving seventeen months of his time was released and returned to Traskwood where his wife and other relatives lived.

After returning, he lived with his wife in peace and harmony, but he drank excessively and got drunk frequently.

Appellant pleaded as defenses that he did not kill his wife, and that if he did, he was in a drunken condition and did not know what he was doing.  There is evidence in the record tending to show appellant was insanely

drunk on the day his wife was killed, and, also, tending to show that he was sober on that day. The murder was committed between six and eight o'clock on Sunday, the 9th day of May, 1937. Grant Baker testified, in substance, that he was with appellant about 1:30 o'clock in the afternoon and was talking with him about his brother. He saw him again about 1:30 or 2 o'clock in the afternoon in Winter's store when he came back from dinner. He saw him again about 8:15 o'clock in Winter's store. Appellant asked for a cigarette paper and made a cigarette and lighted it. He said that he had killed his wife or guessed he had. He said that liquor was the cause of it and for us to beware and take warning. He told us goodbye and shook hands with us. He said he was going away; that he would not see us any more; that he would be dead. He said for us to throw his body in a hole. Witness saw him again about nine o'clock at the saw mill of Mr. Mobley. He had a pint bottle of whiskey in his hand. Witness went to Benton with him. Just before they started appellant was crying and witness asked him why he did it and he said "I didn't want to go back up to the federal penitentiary and I just went blank." He said that his wife told him that if he did not quit drinking he would have to go back to the federal penitentiary and that at that time he went blank. Appellant seemed to know what he was doing when he was talking to witness. He said that whatever he had done, liquor was the cause of it.

Charlie Covington, step-father of appellant, testified that on Sunday afternoon, May 9, 1937, he saw appellant down town. He saw him again about dusky dark. Appellant came over to witness's house and Ora Sims, his wife, was there. She had only been there a few minutes. She was on the back porch and appellant said, "Yes, you run off from me." Witness told him to let her alone, but appellant took her by the arm and jerked her off the porch. She got up and walked out to the back gate and witness and his wife followed them and tried to get him to let her alone and go straight, but he would not pay any attention. Witness and his wife caught up with him and told him again to let her alone; that wit-

ness wanted to talk with him when he got straight and told him that he ought to go home and go to sleep. He was wild looking and crazy looking—whatever you might call it. Appellant said, ''I am not going back to Fort Leavenworth.'' He then went on and did not know what happened. Witness went on to see about calling an officer. When he got something like a quarter of a mile away he heard a scream. He did not know who it was. It took witness about fifteen minutes to make the round trip and when he got back he found appellant's wife lying on the ground. An ax was exhibited to witness and he said that it was his ax, but that it had been over at appellant's house. It was a woman he had heard screaming. When witness returned appellant was not there and he did not see him until three or four days afterwards.

Mrs. Lilly Ray testified that she lived about three or four hundred feet from witness's home. In going to the depot Sunday evening, she saw appellant and his wife. They were walking up and down arm in arm, like anyone would, and were going toward their home. When witness returned she heard screaming and went toward appellant's home, and discovering that some trouble was on she ran away screaming for help. A man at Winter's store heard her and came running and they went to appellant's home and found appellant's wife lying at the gate. She saw a lot of blood and recognized the body as being that of appellant's wife. At the time she heard the screaming it was about five minutes after eight o'clock p. m.

Jason Couch testified that he got word appellant had killed his wife, and went to the telephone to call Mr. Rucker and Mr. Ashley. He saw appellant standing in the road talking to Mr. Mosely, and said he was going to have the whiskey or tear up the God damn place. As he walked up, appellant said, ''Isn't that Jason?'' Mosely told him yes. Witness had a conversation with appellant and appellant asked him if he had called Mr. Rucker and he informed him that Mr. Rucker was not in town. Appellant said he would die and go to hell before he would go back to Leavenworth. Witness asked him what in the world he had done, and he said he guessed he had killed

his wife. Appellant said he didn't know what made him do it; that she had always been good to him. Appellant said he was going to leave, but he told him he could not do that; that he would have to stay and face the music. Appellant had a pint bottle of liquor practically full. Appellant and witness went to Benton in a car. Appellant drank up most of the whiskey on the way to Benton. Witness had a gun on him and appellant told him to go ahead and shoot him. Appellant asked him to give him the pistol that he would finish it up in half a minute; that he would not hurt anybody but himself. Appellant held up a bottle of liquor and said, "This is what sent me to hell and I still am going to stay with it." Appellant gave them a lecture on drinking and what it would do for them. Appellant then said, "I guess I will burn for it, but I have had it coming to me for four or five years." Witness saw appellant between ten and ten-thirty o'clock a. m. and at that time appellant was perfectly sober. When he saw him at Mobley's house later he was drunk. Appellant was asked if he had hurt Ora (his wife) and sometimes he would say, "What did I do it for?" "What made me do it?" Appellant would cry a while and then he would say, "Oh, hell, forget it." Then he would dance and sing. He would act about as normal as any drunk man. He said several times that he was not going back to Fort Leavenworth. Appellant was a lot drunker at the time they got him to jail in Benton than he was when witness first saw him. Appellant had been drinking heavily for the last month.

O. K. Baker testified that he saw appellant in Fay's place of business about eight o'clock p. m. and that he seemed to know what he was doing while in Fay's restaurant; that he had seen him about three or four o'clock in the afternoon in an automobile and that he was drinking, and that witness asked him to let him drive him back to town and he consented. Witness saw him again about six o'clock and said that he was still drunk and that he saw him about ten-thirty or eleven o'clock p. m. after his wife was dead and that appellant looked like a wild man. This was after the murder had been committed an hour or so, but that when he saw him in the

cafe about eight o'clock p. m. he talked with good sense and knew what he was doing.

Bob Summerville testified that he saw appellant about noon and that he acted pretty full and that he saw him again after his wife was dead and that he was then mighty drunk; that he saw him about five-thirty p. m. riding a bicycle.

Dick Barber testified that he saw appellant in the afternoon in Fay's place and that he acted like he was perfectly sober, but that around four o'clock he noticed that he was acting like a drunk person would.

Fay Barber testified that appellant came into Fay's place about two o'clock in the afternoon and that if he had been drinking he could not tell it; during the afternoon he was drunk and appeared to be sick at the stomach and that he gave him some bromo.

Other witnesses testified that he was sober and others that he was drunk.

C. B. Davis testified, in substance, that he was funeral director for R. J. Ashley and a licensed embalmer in Arkansas, Tennessee and Missouri; that he was called on May 8, 1937, and picked up the body of Mrs. Sims, wife of appellant, lying near the front gate of appellant's home; that the body was lying on its stomach with the head turned to the left; that the head was twisted considerably; there was considerable blood there; that he embalmed her; that she must have been struck with a sharp instrument judging from the wounds on her neck and head; that one wound on her neck was a cut about the second or third joint going through the vertebral column and severing the vertebral cord and the esophagus. That the other wound on the neck was about an inch higher and was deep enough to where you could see the arteries in the wound and that grass was in the wound; that there was a cut about the center portion of the face going through the skull and that this cut was crosswise and about two inches long; that there was another cut above it not quite as long that did not go into the skull; that this cut mashed the skull and forced brains to ooze out; that there was another cut on the face severing the lower jawbone; that there was a

scratch or cut several inches long across her back. Witness then identified the clothing he took off the body showing grass stains on the underskirt and hair and brains on the dress and a cut place high up on the neck of the dress. Witness then stated, over the objection of appellant, that the cuts, except the one on her back, were inflicted after the body hit the ground, giving as his reason that brains were on the ground by the head and that grass was in one of the wounds and further reason that the position of the body and the location of the cuts indicated that she was on the ground at the time the cuts were inflicted.

Dr. J. W. Burke testified, in substance, that he was called and, upon arriving at appellant's home, found the dead body of Mrs. Sims and made an examination of her head; that one gash was in her temple; one through the bone (indicating) and one in the joint of the neck. An ax was exhibited to him which he identified as the one that he picked up at the wood pile which looked like it had hair and blood on it; that the ax was found by him about sixty feet from where the body was lying; that he also found blood from the gate to the body and that she was lying in a pool of blood.

We think appellant's conduct and actions just before his wife was killed and his conduct and admissions in a short time after she was killed were sufficient to warrant the jury in finding that he, appellant, killed her with a double-bit ax.

We also think that there was ample evidence of a substantial nature to sustain the finding of the jury that he did know what he was doing when he killed her.

The insistence, therefore, that the evidence was insufficient to support the verdict and judgment is not correct.

The next assignment of error argued is that the court permitted C. H. Davis, the embalmer, to testify that the deceased was struck while lying on the ground. The question propounded to the embalmer was as follows: "Can you tell from your observation of the position of the body whether or not the licks were struck

when deceased was standing or lying down?" His answer in full to the question was as follows:

"A. From the appearance of the body and the location of the licks and the circumstances that I found, I would say those licks were struck after that body had hit the ground. The brains were on the ground by the head; there was grass in one of the wounds. That would have to come from the instrument after it had gone in there, because the grass would never have gotten in the wound had it not been on the point of the instrument when it made the wound. There was only one lick that seemed to me like was made in any other position except lying down and that was the lick on the back. That wound was probably five or six inches long. It was not deep—just like a scratch. Like running under a barb wire fence would make a mark there—probably four or five inches long. It was not deep—just a flesh wound. The other licks would have to have been made lying down to have caused the force they did." The general rule is that non-expert witnesses may not give their opinions concerning transactions, but we are unable to see how any prejudice resulted to appellant on account of the opinion of the embalmer that the cuts were inflicted after deceased was lying on the ground. If appellant intentionally inflicted the wounds that killed her either before or after she fell to the ground he was guilty of murder in the first degree. The position one is in when intentionally assailed and killed by another would not be a defense to the crime nor would it change the degree of the crime. The only defenses interposed were that he did not kill her, but that if he did he was so drunk he did not know what he was doing. What difference would it make then whether he killed her when she was standing up or lying down? Had he pleaded self-defense as an excuse for killing her then her position when killed might have been material, but not so if he assailed and killed her intentionally.

The next assignment of error argued is that the court erred in not permitting Jason Couch to testify that appellant had been drunk for a week before the killing occurred. It is true that the court excluded this testi-

mony when interrogated on direct examination, but on recross examination he was permitted to state that appellant had been drinking heavily for the last month. This removed any prejudice resulting from the refusal of the court to admit the testimony of the witness when first interrogated about the extent of appellant's drinking.

The next assignment of error argued is a refusal of the court to permit counsel to confer with appellant at the time the trial was in progress and just after the noon recess. In the course of the trial, appellant's attorney asked permission to talk to appellant out of the presence of the sheriff, and the court stated that the attorney had had that opportunity at the noon hour, and denied the request. It is not shown that any prejudice resulted to appellant on account of the refusal of the court to permit appellant's attorney to talk to his client out of the presence of the sheriff at the particular time he made the request. The record does not show that he wanted to talk to appellant about anything which might aid him in the trial of the cause.

The next assignment of error argued is that the prosecuting attorney made statements to the jury not warranted by the evidence. The first statement objected to was, "Now, gentlemen, I hope you don't blame me for not bringing appellant's mother into court." And the next statement objected to was "The appellant said to his wife, 'I will show you how to get away from me.' " In both instances the court directed the prosecuting attorney to confine himself to the evidence and said to the jury, "Gentlemen of the jury, you will consider the evidence as given by the witnesses only." If any prejudice might have resulted to appellant on account of these remarks, it was removed by the court when he told the prosecuting attorney to confine his argument to the evidence and told the jury to consider the evidence as given by the witnesses only. *Hicks* v. *State,* 193 Ark. 46, 97 S. W. (2d) 900. The next statement of the prosecuting attorney objected to was, "I am sorry to say that I know what it is to be drunk, but I do know that a man could not get that drunk and not know what he was doing."

When the objection was made the court interrupted and said, "I again instruct the jury that they consider the testimony given by the witnesses only, and the only purpose of an argument of counsel is to refresh your memory as to what the witness testified to." The counsel for appellant then said, "I want the court to instruct the jury not to consider what he knows." The court again said, "The jury will not consider anything only what the witnesses testified to."

We think the statement of the prosecuting attorney is in the nature of an opinion based on testimony and resulted in no prejudice to appellant, but if any prejudice did result it was removed by the statement of the court to the effect that the jury should consider the testimony as given by the witnesses only, and that the only purpose of the argument of counsel was to refresh their memory as to what the witnesses testified to. *Raprich* v. *State,* 192 Ark. 1130, 97 S. W. (2d) 429.

The last assignment of error argued by appellant relates to the giving of instructions over his objection, the refusal to give certain instructions requested by him and the modification of other instructions which he requested. We have read all these instructions very carefully and have concluded that the instructions given by the court were correct, and that the instructions requested and which were refused by him were properly refused, and that the instructions requested by appellant which were modified by him were properly modified.

No error appearing, the judgment is affirmed.

BUTLER and BAKER, JJ., dissent.