4-5592 132 S. W. 2d 390

Opinion delivered October 23, 1939.

*J. M. Jackson* and *Brewer & Cracraft,* for appellant.
*W. G. Dinning,* for appellee.

SMITH, J. This appeal is from a judgment uphold-
ing the will of Habib Etoch, which was unsuccessfully
contested upon the ground that Etoch lacked the testa-
mentary capacity required to make a valid will.

Non-expert witnesses were called, who, after stating
the facts upon which their opinions were based, offered
to state the opinion that Etoch lacked this capacity.
The court declined to permit these witnesses to express
this opinion, and this appeal questions the correctness of
that ruling, which was based, and is defended, upon the
ground that the facts recited by the witnesses were not
of sufficient probative value to permit them to express
their opinions.

The law of the subject has been frequently declared
by this court. The case of *Griffin* v. *Union Trust Com-*

*pany,* 166 Ark. 347, 266 S. W. 289, cites a number of these cases, and in this Griffin Case Chief Justice Mc-Culloch said: "The decisions of this court on the subject are harmonious, and each is to the effect that a non-expert witness may testify as to his opinion after stating the facts upon which the opinion is based, so that the jury may determine what weight to give to the testimony."

Among other cases there cited is that of *Shaeffer* v. *State,* 61 Ark. 241, 32 S. W. 679, from which Judge McCulloch quoted as follows: " 'When a person's mental condition or capacity is in question, the opinions of witnesses who are not experts as to such capacity are only admissible in evidence when taken in connection with the facts upon which such opinions are based. Before such evidence can be admissible, "the specific facts upon which the opinions are based must first be stated by the witnesses, or their testimony must show that such intimate and close relations have existed between the party alleged to be insane and themselves as fairly to lead to the conclusion that their opinions will be justified by their opportunities for observing the party." In other words, the opinion of such a witness is not admissible in evidence until it be first shown by his own testimony that he has information upon which it can reasonably be based. Whether the information is sufficient for that purpose is a question for the court to decide before it can be admitted. After its admission, the weight to be given it is determined by the jury.' "

The question presented for decision is whether, in the application of this test, the trial court erred in refusing to permit the non-expert witnesses to express their opinions that Etoch lacked testamentary capacity.

Mrs. M. W. Miller, who, with her husband, lived in Etoch's home, and who had, for seven years and four months prior to his death, been his housekeeper, and who had known Etoch for a longer period of time, testified as follows: Etoch's conduct was quite a bit different for the last few months before he died. He did

not talk as he had talked before that time and would lead one to believe that he did not know what he was saying. "He would just call and I would go to see what he wanted, and I would find out what he wanted, and he would say he didn't call me, and I would ask him what he wanted, and he would say, not anything, and he would tell me to get out of there, and I wouldn't much more than get out until he would call me again, and I would go and ask him what he wanted, and he would say, not anything." When asked, "How long did he carry on and act that way?", the witness answered: "Better than three weeks before he died." In this connection, it may be said that the will was made April 15, 1938, and Etoch died May 10, 1938, being 26 days thereafter.

This witness further testified that she had asked Etoch to have her room papered, and he answered, "It's yours. It's yours, and you know it is not mine." Etoch would say that he had arranged to have the work done when he had not. Finally, he sent five men on one day to do the work, which caused great confusion as to who would do the work. He said that the paper had been paid for when it had not, and then he would ask witness to pay for it, saying that he didn't have the money. He would not remember what he was saying. He would not remember from one day to the other what he was doing, and I talked to him every day of his life. It was in February that I first noticed him not having his right mind, and that condition continued up until the time of his death."

This witness' husband who lived with her in Etoch's home, testified that Etoch was not out of his house from the 9th of April until the day of his death. That was the day Etoch fell out of his rolling-chair on his way home. He had been for some time previously crippled. Other testimony on the part of this witness corroborated that of his wife as to Etoch's rambling and disconnected conversations.

Etoch's brother-in-law owned the Cleburne Hotel in Helena, and Etoch spent much of his time there. Von-

dereau, who operates the cigar stand in the hotel, testi-
fied that Etoch would sit around the hotel near the news-
stand, and would ask questions and, disregarding the
answers, would soon repeat the question. He would
give the bellboy an order, and when the boy started to
obey it Etoch would call the boy back and repeat the
order. Etoch's condition appeared to grow worse
towards the end.

J. M. Sage had known Etoch for many years. Per-
sons well known to Etoch would come into the hotel, and
Etoch would ask who they were. One of the persons
inquired about was a Mr. Moore whom Etoch had known
for 40 or 50 years. After Etoch had fallen from his
chair, witness visited him at his home. There was
never any connected conversation. Etoch appeared to
be suffering a great deal.

Zollie Brush had known Etoch 40 or 50 years, and
saw him every day, usually at the hotel. Etoch's mem-
ory was not very good. He would telephone from the
hotel for a kind of dope he used, and would sometimes
repeat the order three or four times. He attempted to
sit in the lap of a lady in the hotel. The lady thanked
witness for keeping Etoch off of her. Witness called on
Etoch at his home, but stayed only two or three min-
utes, as Etoch acted so funny. Etoch would play the
punch board in the lobby of the hotel, but didn't know
when he had won. Witness called on Etoch about ten
days before Etoch died, sat on the side of the bed, but
Etoch did not greet him.

Nick Straub lived in Helena all of his life, and knew
Etoch well; saw him on an average of about three
times a week; noticed Etoch doing peculiar things for
two or three weeks prior to his death. One afternoon,
right after lunch, Etoch told his negro body servant to
get his hat, that he wanted to go home and eat supper,
and the negro told him that it was not time for supper,
and that he had just eaten lunch. Etoch got vexed with
the negro. They had to keep the telephone in the hotel
concealed from Etoch, as he used it so frequently; saw

Etoch attempt to sit in a strange lady's lap in the hotel, and saw him give another strange lady a rose.

Albert Newman, another witness who had known Etoch for 50 years or more, gave similar testimony. Etoch would use the telephone, and forget he had used it, and it became necessary to hide the phone from him. Etoch would go to a cafe for his meals, and would forget that he had eaten. This conduct extended over a period of several weeks before Etoch's last illness. Still other witnesses gave similar testimony.

Mrs. George Zambie, an heir-at-law and one of the contestants, testified that Etoch, her brother, attempted to sit in the lap of a lady, who left the hotel on that account. "Another lady came in and he did the same thing, then he went home and he fell down." Witness went to the home of her brother, who was unable to walk. He begged her to take him home, and when witness told him that he was at home and in his own bed, he would repeat the request that he be taken home. This was two or three weeks before Etoch died.

The daughter of Mrs. Zambie who was employed at the hotel, gave testimony to the same effect. Etoch used the telephone so frequently that customers complained about it. Etoch would annoy the guests, and when she would speak to him about it, he would deny having done so. Etoch would try on strangers' hats. "Did everything you could think of." Etoch would eat lunch at about 11 a. m., and when the witness ate at about 12:15 p. m., he would ask her to take him to lunch. He gave his negro servant conflicting orders about waiting on him. Witness saw Etoch at his home nearly every day he was confined to his bed. He would talk, and he did not know what he was telling. She would ask him about familiar things, and he didn't know what she was talking about.

It is true these two witnesses last named were much interested in the litigation; but this interest goes only to their credibility and does not render them incompetent. Other witnesses appear to have had no interest in the litigation.

It appears to us that this testimony shows much more than personal peculiarities or mere idiosyncrasies, especially the testimony relating to Etoch's conduct during the few weeks immediately preceding his death.

There was much testimony to the effect that Etoch was perfectly competent to attend to his business and to make a will, but the question presented for our consideration is whether the court erred in the exclusion of testimony to the contrary. The testimony is very clear to the effect that these witnesses had ample opportunities for observing the mental condition of Etoch, and the only question is whether the facts about which they testified were of sufficient significance to reasonably support the opinions that Etoch did not have testamentary capacity; and we have concluded that it was sufficient to require the submission of this issue to the jury.

In the case of *Raprich* v. *State,* 192 Ark. 1130, 97 S. W. 2d 429, after citing with approval the case of *Griffin* v. *Union Trust Co., supra,* we quoted from Smoot on Insanity, § 597, as follows: " 'Just what amount of knowledge and acquaintance is necessary to qualify such a witness is largely governed by the facts of each case, and within the sound discretion of the trial judge, who may declare the witness incompetent where the preliminary examination shows the facts are insufficient to qualify the witness to express an opinion. But where such witness shows any reasonable opportunity to acquire knowledge of the subject's sanity through observation and association, and is able to state any facts upon which to predicate an opinion, the meagerness of such facts goes rather to the weight to be given the opinion than to its admissibility; and the opinion formed at the time, with the facts upon which it is based, should go to the jury for what it is worth. The weight to be given to such testimony is exclusively within the province of the jury, if the facts upon which the opinion is founded themselves tend to show sanity or insanity.' "

We do not think the testimony here briefly summarized was too unimportant and insignificant to form the basis of an intelligent and reasonable opinion as to

Etoch's mental capacity, and the judgment must, therefore, be reversed for the error committed in excluding the opinions of these non-expert witnesses.

Judgment reversed and cause remanded for a new trial.